668 So.2d 982 (1996)
LEGAL ENVIRONMENTAL ASSISTANCE FOUNDATION, INC., Appellant,
v.
Susan F. CLARK, J. Terry Deason, Joe Garcia, Julia L. Johnson, and Diane K. Kiesling, as the Florida Public Service Commission, Appellees.
No. 85204.
Supreme Court of Florida.
February 29, 1996.
*983 Ross Stafford Burnaman, Tallahassee, for Appellant.
Robert D. Vandiver, General Counsel and David E. Smith, Director of Appeals, Florida Public Service Commission, Tallahassee; and Jeffrey A. Stone, Russell A. Badders and Teresa E. Liles of Beggs & Lane, on behalf of Gulf Power Company, Pensacola, for Appellees.
WELLS, Justice.
We have on appeal two orders issued by the Public Service Commission (the Commission) which set numeric demand-side management goals for Florida's four largest investor-owned electrical utilities. We have jurisdiction, article V, section 3(b)(2), Florida Constitution, and we affirm the Commission's orders.
In accordance with Florida's Energy Efficiency and Conservation Act (FEECA), in June 1993, the Commission initiated proceedings to set numeric demand-side management goals for ten years for Florida's four largest investor-owned utilities: Florida Power and Light Company, Florida Power *984 Corporation, Tampa Electric Company, and Gulf Power Company. See §§ 366.80-366.85, 403.519, Fla.Stat. (1993); Fla.Admin.Code Ch. 25-17, Part I, "Conservation Goals and Related Matters."[1] These goals were to be set in an effort to reduce growth rates of weather-sensitive peak demand, to reduce and control the growth rates of electric consumption, and to increase the conservation of expensive resources such as petroleum fuels. See Fla.Admin.Code R. 25-17.0021(1). Several parties were granted intervenor status in these proceedings, including appellant Legal Environmental Assistance Foundation, Inc. (LEAF).
At the outset of the proceedings, the Commission required each utility to develop a technical market potential result report. In this report, each utility was to address the applicability of numerous potential demand-side management measures[2] to the utility's systems.[3] The utility was then to schedule a meeting with intervenors and the Commission's staff[4] to try to reach a consensus over which conservation measures were potentially applicable to the utility. Next, the Commission required each utility to compile a cost-effectiveness goals results report for every potentially applicable conservation measure. Each utility was to calculate the results of this cost-effectiveness report separately for residential and commercial/industrial classes for winter and summer demand savings, energy savings, and annual and cumulative rate impacts. These cost calculations were to be tallied by using two standards: total resource cost (TRC) and rate impact measure (RIM). Again, meetings were held to allow debate and discussion among the utilities, intervenors, and staff over the methodology used by each utility to reach these results.
Once these reports were completed, the Commission required each party to file a prehearing statement of the party's basic position on the issues in the proceeding. The Commission also required its staff to file a prehearing statement. Thereafter, the Commission issued a prehearing order and held a hearing which lasted over seventeen days. While not presenting any witnesses, the Commission's staff participated during the hearings by cross-examining witnesses and entering items into evidence.
After the hearing, parties filed briefs and posthearing statements. The Commission's staff did not file a posthearing statement but rather filed an advisory memorandum to the Commission recommending disposition of the issues. The Commission then held a special agenda conference at which the Commission's staff advised the Commission. Soon thereafter, the Commission issued an order entitled "Order Setting Conservation Goals." LEAF then filed a motion for reconsideration. While not granting oral argument on the motion, the Commission's "Order Granting in Part and Denying in Part Reconsideration" corrected several numerical errors from the order. These two orders are the subject of this appeal.
*985 LEAF raises three issues with respect to those two orders. In its first issue, LEAF claims that its due-process rights were violated by the Commission's posthearing procedures. More specifically, LEAF claims that the same Commission staff attorney improperly participated at the hearing and advised the Commission at the agenda conferences. We disagree.
We addressed a similar due-process challenge to the Commission staff's participation in an administrative hearing in South Florida Natural Gas Co. v. Pub. Serv. Comm'n, 534 So.2d 695 (Fla.1988). In South Florida Natural Gas, the utility, a gas company, requested a permanent rate increase. After a hearing, the Commission entered an order granting the utility a permanent rate increase which was below the requested amount. On appeal to this Court, the utility challenged the order, claiming that it was deprived of due process because the Commission allowed its staff to examine witnesses and assist in evaluating the evidence. Rejecting the utility's contention, we found that since section 366.06(1), Florida Statutes (1985), compelled the Commission to investigate and determine the propriety of a rate increase, the Commission was clearly authorized to utilize its staff to test the validity, credibility, and competence of the evidence presented in a rate-increase proceeding. See id. at 697-98. We therefore found no due-process violation with the Commission's procedure.
However, we have held that the Commission's discretion in its use of staff is not absolute. See Cherry Communications, Inc. v. Deason, 652 So.2d 803 (Fla.1995). The Cherry court confronted the issue of whether, in a license revocation proceeding, it violated due process for the attorney who prosecuted the case to also meet with the Commission during its deliberations and submit advisory memoranda to the Commission, much of which was adopted by the Commission. In finding a constitutional violation, we acknowledged our decision in South Florida Natural Gas and stated that the Commission has great flexibility in using its staff in a wide range of capacities. We then distinguished the rate-making procedure in South Florida Natural Gas and found in that license-revocation proceeding, the Commission was exercising its quasi-judicial disciplinary authority. Id. at 804. Consequently, we held that it violated petitioner's due process rights to have the prosecuting attorney in a quasi-judicial proceeding invited into the deliberations where his advice was given and acted upon. Id.
We find that the case at bar is more akin to the rate-making proceeding in South Florida Natural Gas and hold that the Commission properly used its staff[5] in making a determination of the demand-side management goals for the next ten years.[6] Under *986 section 366.81, Florida Statutes (1993), the Commission was directed to develop and adopt overall goals and was authorized to require each utility to develop plans and implement programs for increasing energy efficiency and conservation within its service area, subject to the approval of the Commission. Thus, the Commission was required to ensure that each utility's plans were appropriate. Just as we have found that the Commission may appropriately utilize its staff to test the validity, credibility, and competence of the evidence presented in a rate-increase hearing, see South Florida Natural Gas, we here find that the Commission may use its staff to evaluate the evidence presented in this goal-setting procedure.
Likewise, we find no merit to LEAF's second issue, that the Commission's order adopted a pass/fail goal policy which is inconsistent with the law and the Commission's rules. In the order setting conservation goals, the Commission stated that the goals set in this docket are not aspirational and any utility that does not achieve its goals would either be penalized or have programs prescribed to it on a case-by-case basis. LEAF claims that this policy contravenes both the statutes[7] and the rules,[8] which refer to "goals" rather than a pass/fail policy. At the outset, we must determine whether LEAF has standing to appeal the Commission's decision.
Section 120.68(1) sets forth the standard for judicial review of administrative action and states that "[a] party who is adversely affected by final agency action is entitled to judicial review." Thus, there are four requirements for standing to seek such review: (1) the action is final; (2) the agency is subject to provisions of the act; (3) the person seeking review was a party to the action; and (4) the party was adversely affected by the action. See Daniels v. Florida Parole & Probation Comm'n, 401 So.2d 1351 (Fla. 1st DCA 1981), aff'd sub nom. Roberson v. Florida Parole & Probation Comm'n, 444 So.2d 917 (Fla.1983).
Pursuant to those requirements, the question here with respect to LEAF's standing is whether, as an intervenor, it was a "party" and if so, whether LEAF will be adversely affected by the Commission's action.[9] Florida Administrative Code Rule 25-22.039 allows persons who have a substantial interest in the proceeding and desire to become a party to intervene. Early in these proceedings, LEAF filed a petition to intervene. The petition stated:
LEAF is a public interest advocacy organization located in Tallahassee Florida. The goals established in this docket will create regulatory incentives or disincentives for Florida Power and Light ("FPL") to increase the efficiency with which it delivers energy services. The corporate purposes of LEAF include securing the environmental and health benefits of increased efficiency in the delivery of energy services. A substantial number of LEAF's members use and enjoy the natural resources whose quality is placed at risk by construction and operation of power plants that may result from regulatory incentives to increase electricity sales and build new power plants rather than increase investments in energy efficiency and conservation. LEAF members also include FPL customers whose energy service bills are substantially affected by FPL's conservation *987 and efficiency efforts, as well as its selection of capacity supply options.
The Commission granted LEAF's petition to intervene, and we find that LEAF was a party to this action. See § 120.52(12)(c), Fla. Stat. (1993).
This determination, however, is not dispositive of the issue of whether LEAF has standing to appeal the Commission's action. We agree with what the First District stated in Daniels:
The APA's definition of party recognizes the need for a much broader zone of party representation at the administrative level than at the appellate level. For example, in rulemaking, a large number of persons may be invited or permitted by the agency to participate as parties in the proceeding, so as to provide information to the agency concerning a broad spectrum of policy considerations affecting proposed rules. See Balino v. Dept. of Health and Rehab., etc., 362 So.2d 21 (Fla. 1st DCA 1978). Yet, a person who participates in such a proceeding by authorization of a statute or rule, or by permission of an agency, may not necessarily possess any interests which are adversely, or even substantially, affected by the proposed action.
401 So.2d at 1354; see also Fox v. Smith, 508 So.2d 1280 (Fla. 3d DCA 1987). LEAF must therefore still demonstrate that it will be adversely affected by the Commission's decision.
As noted above, LEAF's stated interest in this case as a public interest advocacy organization is to protect its members' use and enjoyment of Florida's natural resources by seeking to avoid unneeded new power plants and obtaining lower energy costs to customers. This interest parallels the legislative intent of FEECA, which seeks to utilize the most efficient and cost-effective energy conservation systems to protect the general welfare of Florida and its citizens. See § 366.81, Fla.Stat. (1993). Once the Commission set goals which it believed were reasonably achievable, it sought to ensure that each utility would achieve these goals. As the Commission stated in its order granting in part and denying in part reconsideration:
The setting of pass/fail conservation goals furthers the rule's purpose of promoting reliability in the planning process. By subjecting utilities to the possibility of a penalty or Commission prescribed programs should they fail to achieve their goals, the Commission is increasing the likelihood that goals will be achieved. In turn, the likelihood that DSM efforts will truly avoid and defer generating capacity is increased.
From our review of the record and LEAF's written and oral arguments, we simply find no basis upon which to conclude that LEAF's interests are adversely affected by this agency action. Only the affected utilities would have standing to seek review of this particular agency action, and none of the utilities have sought review. Accordingly, we hold that LEAF does not have the requisite standing to contest this portion of the Commission's order on appeal.
Finally, we reject as without merit LEAF's third argument: that the Commission erred in finding there was a negligible energy and demand savings difference between demand-side management portfolios based on the different cost effectiveness tests. When reviewing a Commission's order, the standard of review is whether there is competent, substantial evidence in the record to support the order. See § 120.68(10), Fla.Stat. (1993). Further, Commission orders come before this Court cloaked with the presumption of validity. See Citizens of State v. Pub. Serv. Comm'n, 448 So.2d 1024 (Fla.1984). Since we find that the record supports the Commission's order, we affirm the decision.
The contested portion of the order setting conservation goals states:
B. COST EFFECTIVENESS CRITERIA
We will set overall conservation goals for each utility based on measures that pass both the participant and RIM tests. The record in this docket reflects that the differences in demand and energy saving between RIM and TRC portfolios are negligible. We find that goals based on measures that pass TRC but not RIM would result in increased rates and would cause customers *988 who do not participate in a utility DSM measure to subsidize customers who do participate. Since the record reflects that the benefits of adopting a TRC goal are minimal, we do not believe that increasing rates, even slightly, is justified.
Although we are setting goals based solely on RIM measures, we encourage utilities to evaluate implementation of TRC measures when it is found that the savings are large and the rate impacts are small. Some measures that may fall into this category are solar water heating, photovoltoics [sic], high efficiency on-site cogeneration, renewable resources, end-use natural gas and commercial lighting.
Upon petition from a utility, lost revenue recovery and stockholder incentives shall be considered on a case-by-case basis for such TRC measures that result in large savings and small rate impacts. We are not implying that lost revenue recovery or incentives will be approved across the board for all such programs. Rather, each program or program portfolio will be considered on a case-by-case basis for incentives and lost revenue recovery.
Utilities are free to file whatever portfolio of programs they wish, including TRC programs, in order to meet their goals. Demand and energy savings achieved through Commission approved TRC programs (including programs approved for incentives and lost revenue recovery) shall be counted toward each utility's RIM based goal.
Each utility's RIM based conservation goal shall be considered to be a minimum, pass/fail goal. We are not setting aspirational goals in this docket. Each utility shall be expected to achieve its goal. Any utility that does not achieve its goal shall be either penalized or have programs prescribed to it in a manner to be determined by this Commission on a case-by-case basis.
Additionally, LEAF objected to this portion of the order in a motion for reconsideration. In response to this motion, the Commission responded:
As previously discussed, LEAF's tables showing the savings differences between TRC and RIM on pages 13 and 14 contain several mathematical errors. Despite this fact, the "substantial" versus "negligible" savings question cannot be answered solely through a comparison of TRC to RIM MW and MWH (megawatt hour) savings. Differences in MW and MWH savings may be substantial in isolation, but negligible when viewed from a rates, generation expansion, and revenue requirements perspective. In this docket, when we compared the MW and MWH savings in each RIM and TRC portfolio and the differences between the two, to each utility's system peak demand and energy sales, the savings are negligible. The use of the word "negligible" is the result of an overall cost-effectiveness evaluation, and not just consideration of one-piece, such as MW or MWH savings. A complete and balanced view was provided in the staff recommendation and at the Special Agenda. We made an informed decision after comparing the higher rate impacts of the TRC portfolio to the RIM portfolio. Apart from the corrections previously addressed, LEAF has shown no appropriate ground for reconsideration.
In instructing the Commission to set conservation goals for increasing energy efficiency and conservation, the legislature directed the Commission to not approve any rate or rate structure which discriminates against any class of customers. See § 366.81, Fla. Stat. (1993). The Commission was therefore compelled to determine the overall effect on rates, generation expansion, and revenue requirements. Based on our review of the record, we find ample support for the Commission's determination to set conservation goals using RIM measures. Accordingly, we affirm the orders of the Commission.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING and ANSTEAD, JJ., concur.
NOTES
[1] The Commission also considered two federal conservation standards set forth in the Public Utility Regulatory Policies Act of 1978, amended by subtitle B, section 111 of the Energy Policy Act of 1992. See 16 U.S.C. § 2621(d)(7), (d)(8) (1994). These standards are commonly referred to as "Integrated Resource Planning" and the "Income Neutrality" standards.
[2] The Commission required each utility to address the 110 potential demand-side management measures listed in Synergic Resources Corporation's Report No. 7777-R8, "Electricity Conservation and Energy Efficiency in Florida: Technical, Economic and Achievable Results, Final Report." Additionally, the Commission required each utility to address measures employing natural gas and renewable energy resources and other demand-side management measures considered by the utility.
[3] Each utility was required to consider at a minimum: (1) whether the measure would be better implemented by building codes; (2) whether the measure is related more to lifestyle and behavioral characteristics so that it would be better implemented by customer self-adoption; (3) whether the measure would be better implemented in a different service territory due to technological, climatical, demographic, or other factors; or (4) whether the measure requires further research to determine applicability.
[4] The Commission's staff consisted primarily of attorneys from its Office of the General Counsel and Division of Electric and Gas. See Fla.Admin.Code R. 25-21.021, and 25-21.028.
[5] Florida Administrative Code Rule 25-22.026(3) states that the Commission staff's primary duty is to "represent the public interest and see that all relevant facts and issues are clearly brought before the Commission for its consideration." LEAF's claim revolves around a Commission staff attorney from the Division of Legal Services who both cross-examined several witnesses during the proceeding and, along with other staff attorneys, advised the Commission during its deliberations in a utility's goal conservation proceeding. The Division of Legal Service's role is further clarified in the rules:

The Division of Legal Services supervises the procedural and legal aspects of rate cases and other formal proceedings before the Commission, the Division of Administrative Hearings and, on behalf of the Commission, in civil court proceedings. This Division also represents the staff before the Commission and issues reports and recommendations to the Commission as requested.
Fla.Admin.Code R. 25-21.021(2).
[6] We note that at the prehearing conference, a member of the Commission explained what the staff's role in the proceeding would be, stating:

But I also want to indicate that I believe Staff is in a slightly different category than the other parties and that Staff has an obligation to make sure that the record is complete and to give a recommendation to the Commissioners at the conclusion of this. I have foundI have often been an advocate of having positions stated by Staff early on in the process. I have found that at times, though, that has been counterproductive, that in some parties' minds that has been perceived as a statement by the Staff that they're going to pursue that position as an advocate of that position, regardless of what the record shows, and that they're going to recommend that at the end of the hearing. And I want to dispel that perception by parties. That is not Staff's role; that even if they initially take a position, that if the evidence in the case shows contrary, not only should, but they're under obligation to make a recommendation to the Commissioners which is consistent with the best evidence which is in the record. So often times, having Staff state a position this early in the process is misunderstood by parties as that being an advocacy role being played by Staff for that particular issue; and Staff does not have an advocacy role in this type proceeding.
[7] See § 366.82, Fla.Stat. (1993).
[8] See Fla.Admin.Code R. 25-17.001(6).
[9] The Commission is subject to the provisions of the Administrative Procedure Act except where specifically provided otherwise. See ASI, Inc. v. Florida Pub. Serv. Comm'n, 334 So.2d 594 (Fla. 1976); Van Gorp Van Serv., Inc. v. Mayo, 207 So.2d 425 (Fla.1968). Also, "agency action" is defined as the whole or part of an order. See § 120.52(2), Fla.Stat. (1995). This portion of the order became final agency action once the order was reduced to writing and filed with the person designated by the agency as clerk. See § 120.52(11), Fla.Stat. (1995).