OVERTON, Justice.
We have on appeal a decision of the Florida Public Service Commission finding that BellSouth Telecommunications, Inc., (Bell-South) may no longer charge Harris Corporation (Harris) for the use of facilities Bell-South installed on Harris’s complex, but that Harris is not entitled to a refund for charges previously imposed by BellSouth for the use of those facilities. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const. For the reasons expressed, we affirm the Commission’s decision.
In 1995, Harris filed a complaint against BellSouth, asserting that BellSouth has been unlawfully charging for wiring BellSouth installed on Harris’s semiconductor complex. During the course of the proceedings, the parties filed a stipulated set of material facts and agreed to an informal hearing before the Commission. The stipulated facts were set forth as follows:
1. The “Harris Semiconductor Complex” is a campus consisting of approximately 13 buildings, located at 2401 Palm Bay Road, Palm Bay, Florida.
2. The facilities at issue are located on the Harris Semiconductor Complex, and were originally installed by BellSouth.
3. The demarcation point is in Building 53. All of the wiring at issue is on Harris’s side of the demarcation point. At least some of the network terminating devices on the facilities at issue were installed in Building 53 during or after 1988.
4. The facilities at issue connect the PBX in Building 53 to telephone closets in Buildings 51, 54, 58, 58A, 59, 60, 61, 62 and 63. All facilities run directly from Building 53 to telephone closets in those other buildings, except that the wiring for Building 61 runs from Building 53 into Building 60 and then back out of Building 60 to Building 61. Harris-owned, Harris-installed inside wiring connects the telephone closets to customer premises equipment (CPE) in the corresponding buildings.
5. None of the facilities at issue crosses a public road. All of the facilities at issue run between the buildings identified above in Stipulation No. 4, and all are underground (except at the point of connection to the above-referenced buildings).
6. The facilities were installed at the time that the respective building in which each terminates was constructed. The first building was built and occupied in 1969. The last building was occupied in 1984.
7. BellSouth has recorded and continues to record the facilities at issue in Account 242.
8. BellSouth has charged for the facilities at issue as Series 2000 Channels (with USOC 1LVDE), pursuant to Section A113 of its Florida General Subscriber Services Tariff.
9. BellSouth states that these charges include private line service.
10. BellSouth has charged, and Harris has paid, $172,080.14 (not including taxes) for the facilities from January 1, 1989 to January 1996.
11. Harris has continued to pay for the facilities at issue at the rate of approximately $2,000 per month since then; these payments are not included in the $172,-080.14 total given above.
In essence, these facts reflect that BellSouth installed telephone wiring in Harris’s semiconductor complex between 1969 and 1984; that the wiring is all on Harris’s property, connects telephone closets in numerous buildings throughout Harris’s complex, runs between the complex buildings, and is all underground except at the point of connection to the buildings; and that, since the installation of the wiring, BellSouth has been imposing monthly charges on Harris for the wiring. Harris has continued to pay the charges but contends that, pursuant to orders of the Florida Public Service Commission and the Federal Communications Commission (FCC), BellSouth should have ceased charging for the wiring by January 1, 1989.
*528 FCC regulations govern how wiring is “booked” or “recorded” for accounting purposes. The issues in this case concern whether the wiring at issue should have been booked in account 232 (station connections— inside wire) or account 242 (aerial, buried and underground cable). At the time the wiring was initially installed, it made little difference to which account the wiring was booked. However, in the 1980s, the FCC issued a series of orders, opinions, and reports in three separate dockets governing the type of wiring at issue, which redefined the wiring and eventually led to this dispute.[1] In summary, the FCC redefined the type of wiring in this case as being “complex inside wire,” deregulated such wiring that was recorded in account 232, and required telephone companies to amortize facilities booked to that account and to cease charging customers for those facilities by a given date in the future. No such deregulation or amortization for wiring -booked to account 242 was required. Because the wiring at issue was installed between 1969 and 1984, BellSouth did not have the benefit of these decisions in determining how to record the wiring; BellSouth booked the wiring to account 242 when it was installed.
In this proceeding, Harris argued before the Commission that the wiring at issue was complex inside wire as defined by the FCC and, as such, it should have been recorded in account 232. According to Harris, BellSouth should have ceased charging for such wiring by January 1,1989, because, under deregulation, the inside wiring was to have been fully amortized by December 31, 1988. Based on the monthly fees paid by Harris to Bell-South, Harris estimated that, by January 1996, it was due a refund in the amount of $172,080.14 plus interest and taxes, plus any money paid to BellSouth after that time.
BellSouth contended that, under FCC regulations in effect at the time the wiring was installed, the wiring was properly recorded in account 242 as outside cable. BellSouth asserted that the FCC’s subsequent orders, opinions, and reports labeling the type of wiring at issue as complex inside wire and requiring such wire to be booked in account 232 were prospective only. BellSouth further argued that the Commission itself approved the recording of the wiring and charges at issue in In re Southern Bell Telephone & Telegraph Co.—Proposal to Discontinue Provision of New Complex Inside Wire, 84 F.P.S.C. 9:178 (Sept. 14, 1984).
In its final order resolving this dispute, which is the subject of this appeal, the Commission agreed with Harris that the wiring is properly characterized as complex inside wiring under current FCC regulations, that this complex inside wiring should be recorded in account 232, and that Harris should not be charged for this wiring in the future. The Commission refused, however, to order Bell-South to refund the post-January 1, 1989, charges for the wiring.
The Commission first determined that inconsistencies existed in the rules governing accounts 232 and 242. Specifically, the Commission concluded that note B to account 232 was unclear in providing guidance as to whether the wiring at issue should be booked *529 to account 232 or account 242 prior to 1984. Note B to account 232 provided that “outside plant wiring” should not be charged to account 232. The ambiguity rests on the meaning of “outside plant”; that is, whether the wiring at issue fell within the meaning of note B because it was “outside” Harris’s buddings or did not fall within the meaning of note B because it was “outside” Harris’s system. Although the Commission agreed that note B could be interpreted to include the wiring at issue, it concluded that the FCC’s subsequent orders, opinions, and reports reflected the FCC’s intent that such wiring be recorded in account 232 and amortized. The Commission noted, however, that the FCC never issued an order specifically requiring the reclassification of such wiring to account 232. Consequently, the Commission concluded that BellSouth had not violated any rules, regulations, or orders of either the Commission or the FCC in having booked the wiring to account 242 when it was installed or in continuing to charge Harris for the wiring. Accordingly, it refused to order a refund. Having determined, however, that the FCC intended for this type of wiring to have been booked to account 232 and amortized, the Commission concluded that BellSouth should not impose any future charges on Harris for the wiring.
Harris has appealed this decision, contending that the Commission should have ordered a refund. According to Harris, the Commission has misinterpreted note B and the FCC’s orders, opinions, and reports regarding whether the wiring originally should have been placed in account 232 or 242. Bell-South, on the other hand, has cross-appealed the Commission’s order, asserting that the FCC’s directives regarding the recording of the type of wiring at issue were prospective only and that BellSouth should be allowed to continue charging for the wiring.
In evaluating these contentions, we must start with the well-established legal principle that Commission orders come to this Court with a presumption of validity and are entitled to great deference. AmeriSteel Corp. v. Clark, 691 So.2d 473, 477 (Fla.1997)(Commission’s interpretation of statutes it is charged with enforcing entitled to great deference); Legal Envtl. Assistance Found., Inc. v. Clark, 668 So.2d 982 (Fla.1996). As we noted in AmeriSteel, “We will approve the Commission’s findings and conclusions if they are based on competent substantial evidence, and if they are not clearly erroneous.” 691 So.2d at 477.
We conclude that the Commission appropriately acted within its discretionary authority in refusing to grant a refund to Harris for the post-1988 charges imposed for the wiring by BellSouth. As previously noted, we must give great deference to interpretations made by the Commission of the FCC rules and regulations it is charged with enforcing, and we must approve the Commission’s findings and conclusions if they are based on competent substantial evidence. AmeriSteel Corp., 691 So.2d at 477. In this case, the Commission found in pertinent part as follows:
With respect to BellSouth’s argument on Note B of Account 242, we believe that prior to 1984, that note could be interpreted to include the facilities at issue. On the other hand, we believe that the FCC’s Final Rule is clear that the FCC intended that embedded intrasystem wiring be recorded in Account 232 and amortized in accordance with its Expensing Order. Nonetheless, Note B continued to be reflected in Account 242 thereafter and the FCC never issued an Order requiring the reclassification of such facilities to Account 232.
[[Image here]]

Although we find that the facilities are complex inside wire, it does not appear BellSouth has violated any Florida rules, regulations or statutes. Further, given the apparent inconsistency between the FCC’s Final Rule and Note B to Account 21,2, it is unclear whether any FCC rules or regulations have been violated.

[[Image here]]

As demonstrated above, it is unclear whether BellSouth has violated rules, orders, or regulations regarding the account
*530
ing treatment of the facilities at issue. In light of this, we will not order a retroactive refund of charges to Harris.

(Emphasis added.)
In sum, ■ the Commission concluded that BellSouth had not violated any rules, regular tions, or orders of either the Commission or the FCC in having booked the wiring to account 242 when it was installed or in continuing to charge Harris for the wiring based on the ambiguities under which Bell-South was operating. As a result, the Commission found it improper to order a refund.
Additionally, the Commission specifically represented to this Court that, even if it determined that a refund were warranted, it could not order such a refund. First, the Commission notes that, because BellSouth had recorded the facilities in account 242, it had not amortized the facilities but instead had been achieving recovery of the facilities through normal accounting treatment and through tariff charges. Consequently, the Commission stated that it was unclear when the facilities at issue were fully expensed. As the Commission noted: “While it is unlikely that any balance remains on the books today for those facilities, it is probable that a portion of those facilities remained recorded on the books after January 1, 1989.” Further, BellSouth was charging not only for the use of the wire but was also charging for private line service, and the stipulated facts before the Commission provided no breakdown of the use and private line charges. Thus, the Commission stated that, even if a refund were appropriate, it had no information before it to make an informed decision regarding the amount to be refunded.
On these facts, we find the Commission’s decision that no refund is warranted to be reasonable. .This is especially true given that, under these circumstances, ordering a refund to Harris might provide Harris with funds to which it is not properly entitled.
Accordingly, we affirm the decision of the Commission.
It is so ordered.
KOGAN, C.J., and SHAW and ANSTEAD, JJ., concur.
GRIMES, Senior Justice, dissents with an opinion, in which HARDING and WELLS, JJ., concur.

. First, the FCC directed that future inside wiring costs should be expensed and that embedded investment in unamortized inside wiring should be amortized over a ten-year period. First Report and Order, 85 F.C.C.2d 818 (1981). Subsequently, the FCC detariffed new intrasystem wiring and concluded that embedded intrasystem wiring would be addressed separately. Final Rule, 48 Fed.Reg. 50,543 (1983). In that same rule, it concluded that intrasystem wiring should be recorded in account 232. Thereafter, the FCC determined that intrasystem wiring should not be removed from regulated service because it could have an adverse effect on competition and on users. Report and Order, 95 F.C.C.2d 1276 (1983). The FCC later issued an order distinguishing between simple and complex inside wiring. Second Report and Order, 59 Rad. Reg.2d (P & F) 1143 (F.C.C.1986). In the Second Report and Order, the FCC redefined complex inside wiring and detariffed the maintenance of such wiring effective January 1, 1987. It also ordered the relinquishment of ownership with respect to inside wiring recorded in account 232 concurrent with reaching the point of full amortization or zero net investment. Finally, in 1986, the FCC revisited the relinquishment requirements and ordered that the telephone companies could not require customers to purchase inside wire that had been fully amortized nor could they charge customers for the use of such wiring but that the companies could collect maintenance fees on an untariffed basis provided the companies used the accounts provided for unregulated activities. Memorandum Op. and Order, 1 F.C.C.R. 1190 (1986).