# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

———————————————

No. 1D17-4425

———————————————

THE CITIZENS OF THE STATE OF
FLORIDA, THROUGH THE FLORIDA
OFFICE OF PUBLIC COUNSEL,

Appellant,

v.

FLORIDA PUBLIC SERVICE
COMMISSION; UTILITIES, INC. OF
FLORIDA; SUMMERTREE WATER
ALLIANCE; ANNE MARIE RYAN;
and SEMINOLE COUNTY,
FLORIDA,

Appellees.

———————————————

On appeal from the Florida Public Service Commission.

March 13, 2019

MAKAR, J.,

This appeal involves a challenge to the Florida Public Service Commission's approval, in part, of requested increases in water and wastewater rates sought by Utilities, Inc. of Florida (UIF) for its consolidated operations in Florida, which consist of twenty-seven individual merged systems.

I.

The Office of Public Counsel (OPC), which provides legal representation on behalf of the citizens of the State of Florida in utility cases before the Florida Public Service Commission,[1] raises three issues: (a) whether the Commission violated due process by amending UIF's requested utility plant additions in the rebuttal stage of the proceeding and admitting exhibits offered by its staff over OPC's objection; (b) whether the Commission's analysis of the Sandalhaven and Lusi wastewater systems departed from the standards for "used and useful" analysis set forth in section 367.081(2)(a) 2. a., b., c., Florida Statutes; and (c) whether the Commission erred by imposing quality of service penalties on individual systems within UIF's consolidated system despite establishing uniform rates for the twenty-seven systems under UIF's control.

A.

The gravamen of OPC's due process claim is that allowing UIF to modify the parameters of its requested pro forma plant additions, thereby increasing the overall cost of the total project, was improper during the rebuttal phase of the proceedings. UIF counters that its expert, Patrick C. Flynn, testified in response to matters raised by an OPC witness, and that updated cost estimates are to be expected during the rate-setting process.

A review of the voluminous record reveals no due process violation involving consideration of the pro formas. Adequate notice and opportunity to contest UIF's evidence and its expert as to the pro forma adjustments were afforded, including discovery, depositions, and cross-examination at the hearing. OPC's motion

---

[1] *See* § 350.061, Fla. Stat. (2018); *see Citizens of Fla. v. Mayo*, 333 So. 2d 1, 6 (Fla. 1976) ("[OPC] was created with the realization that the citizens of the state cannot adequately represent themselves in utility matters, and that the rate-setting function of the Commission is best performed when those who will pay utility rates are represented in an adversary proceeding by counsel at least as skilled as counsel for the utility company.").

to strike Flynn's testimony and its reconsideration motion were denied via written orders containing reasonable grounds for each ruling. And no claim is made alleging that inadequate time was allocated (OPC did not seek a continuance). The fact that plant additions exceeded the estimates of those initially sought via the pro formas can be explained by updated forecasting estimates, which are continually subject to revision based on current and expected market conditions. The Commission says its practice is to consider updated pro forma cost information that utilities provide, even during rebuttal, which is acceptable if OPC and other participants in the hearing are given a reasonable opportunity to object and be heard. Our review of the record leads us to conclude that due process was afforded as to the pro formas.

OPC also claims a denial of due process because Commission staff failed to act in a neutral manner when it entered evidence provided by its staff that favored UIF over OPC's objection. OPC correctly points out that it is not the Commission's or its staff's responsibility to assist a utility in meeting the utility's burden of proof. That said, the Commission notes that its staff routinely cross-examines utility witnesses as part of the rate-making process to ensure completeness and accuracy, and that none of its staff, who were involved as witnesses in the case, were allowed to advise commissioners or participate in writing recommendations for the Commission to consider.

Members of a regulatory body's staff can have direct involvement in an adversarial proceeding so long as sufficient safeguards are in place to ensure compliance with due process standards. Substantial reliance on and deference to staff is commonplace in the regulatory world and is generally lawful in rate-making proceedings. *See S. Fla. Nat. Gas Co. v. Pub. Serv. Comm'n*, 534 So. 2d 695, 698 (Fla. 1988) ("We find that the commission is clearly authorized to utilize its staff to test the validity, credibility, and competence of the evidence presented in support of an increase."); *Legal Envtl. Assistance Found., Inc. v. Clark*, 668 So. 2d 982, 986 (Fla. 1996) ("Commission may use its staff to evaluate the evidence presented in this goal-setting procedure."). In *Clark*, for example, the Commission's staff "participated during the hearings by cross-examining witnesses

and entering items into evidence," which was held to be permissible under due process principles. 668 So. 2d at 984.

The "Commission's discretion in its use of staff is not absolute," *id.* at 985, and has its limits limited under the state due process clause. Art. I, § 9, Fla. Const. ("No person shall be deprived of life, liberty or property without due process of law . . . "). For example, in *Cherry Communications, Inc. v. Deason*, 652 So. 2d 803, 805 (Fla. 1995), *as revised on denial of reh'g*, (Apr. 20, 1995), our supreme court held that it was a due process violation where a Commission staff attorney who prosecuted a license revocation proceeding was allowed to meet with the Commission during deliberations and provide post-hearing legal advice. The same staff attorney who played the "role of prosecutor" by cross-examining witnesses, raising legal objections, and arguing against the interests of the telecommunications company "assumed the role of advisor to the Commission, which was now supposedly deliberating as an 'impartial' adjudicatory body." *Id.* This dual role caused the adjudicatory process to be compromised, such that "the playing field appears to have been tilted when the prosecutor was invited into the deliberations and his advice was acted upon." *Id.* at 805. The revocation order was vacated and a new hearing ordered. *Id.*

With these cases in mind, our review of the record fails to show that the involvement of the Commission's staff in the rate-making process in this proceeding amounted to a due process violation. From OPC's vantage point, it may have appeared that staff was exceeding their role, but the caselaw just discussed gives the Commission much leeway in rate-making cases to use its staff in the evidentiary process as was done here. Moreover, a distinction is made between rate-making proceedings and adjudicatory proceedings involving revocation of licenses. *See Cherry*, 652 So. 2d at 804 (noting that *South Florida Natural Gas* "involved the Commission's exercise of its rate-setting authority rather than its quasi-judicial disciplinary authority."). We recognize that great solicitude is paid to due process in the adjudicatory setting where the Commission plays a quasi-judicial role, but that doesn't mean the Commission's discretion is unlimited in rate-making proceedings, only that it is given broader latitude. We are not confronted with a situation where a regulatory

4

body has abdicated its responsibility to, or been "captured" by, its staff to such an extent that its regulatory role has been compromised. Thomas O. McGarity, *The Internal Structure of EPA Rulemaking*, 54 LAW & CONTEMP. PROBS. 57, 111 n. 133 (1991) ("Staff capture . . . occurs when a politically appointed official becomes so immersed in day-to-day briefings by the agency's professional staff that he or she loses his or her objectivity (or perhaps ideology) and begins to view the world from the staff's perspective."). Rather, the record in this case shows that the staff's involvement falls within acceptable constitutional limits such that the requirement of due process was met.

B.

Next, OPC claims that the Commission erred in its "used and useful" methodology by including pre-paid connections for future potential development as part of the rate-making process. Developers pre-pay for the right to connect to the systems at some unspecified future date, if ever. The specific question is whether pre-paid connections are statutorily permitted such that they become "used and useful" for inclusion in a utility's rate base. Secondarily, OPC says that the Commission has not adequately explained its decision to include pre-paid connections in this case.

As this Court has stated, a "regulated utility is entitled to an opportunity to earn a fair rate of return on its 'rate base'—the capital prudently invested in the utility's facilities that 'are used and useful in the public service.'" *Palm Coast Util. Corp. v. State, Fla. Pub. Serv. Com'n*, 742 So. 2d 482, 484 (Fla. 1st DCA 1999) (quoting section 367.081(2)(a), Fla. Stat. 1995). The Commission has much discretion is deciding the factors upon which it relies in determining whether a component of a water/wastewater system is deemed "used and useful" under the statutory framework. *Id.* ("[I]ts determination of the applicable 'used and useful' considerations should be given great weight since such considerations are infused with policy considerations for which the Commission has special responsibility and expertise."). And it is entitled to modify its "used and useful" policy so long as it is "supported by expert testimony, documentary evidence or other evidence appropriate to the nature of the issue involved." *Id.* at 485.

The Commission's discretion is limited, however, by the language of statutory text and now by the constitutional amendment that prohibits courts from deferring to an agency's interpretation of a statute. Art. V, § 21, Fla. Const. ("In interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo."). In either case, review of the legal meaning of a statute is de novo; it is our responsibility to say what the applicable law is. *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

The Commission has included pre-paid connections as used and useful in a handful of prior rate cases, but no court has passed upon whether legal authority for doing so exists. OPC points out that pre-paid connections and their use are not mentioned in the applicable statutes or administrative rules and thereby are off-limits. OPC also asserts that the Commission's use of pre-paid connections is limited by a 1999 revision to the "used and useful" statute, which set *temporal* limits on the consideration of utility property for rate-making purposes:

> 2. For purposes of such [rate-making] proceedings, the commission shall consider utility property, including land acquired or facilities constructed *or to be constructed within a reasonable time in the future, not to exceed 24 months* after the end of the historic base year used to set final rates *unless a longer period is approved by the commission*, to be used and useful in the public service, if:
>
> > a. Such property is needed to serve *current customers*;
> >
> > b. Such property is *needed to serve customers 5 years after the end of the test year* used in the commission's final order on a rate request as provided in subsection (6) at a growth rate for equivalent residential connections *not to exceed 5 percent per year*; **or**

6

c. *Such property is needed to serve customers more than 5 full years after the end of the test year* used in the commission's final order on a rate request as provided in subsection (6) *only to the extent that the utility presents clear and convincing evidence to justify such consideration.*

§ 367.081(2)(a)2. a., b., c., Fla. Stat. (2018) (emphasis added). The highlighted portions establish a schedule of permissible time limits for when property can be deemed used and useful, ranging from the needs of current customers to the needs of customers up to five years after the end of test year (subject to a five percent growth rate) to the needs of customers more than five full years after the end of the test year (subject to a higher standard of proof).

OPC claims this statute fails to give authority for the pre-paid connections in this case because they represent only potential future connections that would occur, if ever, at some unspecified time perhaps beyond the statutory time limits. Indeed, a number of pre-paid connections never came to fruition. Because pre-paid connections lack a timeframe, they are speculative and contrary to how section 367.081(2) was intended to apply temporally in rate cases.

The Commission counters that it has broad regulatory powers and that it has specific authority in subsection (2)(a)2. b. for its action, which for short we'll term the "Five-Year/Five-Percent Law". According to the Commission, this subsection requires it "to consider utility property as being used and useful in the public service if such property is needed to serve customers 5 years after the end of the test year at a growth rate for equivalent residential connections not to exceed 5 percent per year." It also points to Rule 25-30.432, Florida Administrative Code, entitled "Wastewater Treatment Plant Used and Useful Calculations," which implements section 367.081(2) as additional authority. It says that this administrative rule "provides that the Commission will consider *other factors* in addition to the allowance for growth that is addressed in" the Five-Year/Five-Percent Law. (Emphasis added). Indeed, the rule does make mention of "other factors" as follows:

7

> In determining the used and useful amount, *the Commission will also consider **other factors** such as* the allowance for growth pursuant to Section 367.081(2)(a) 2., F.S., infiltration and inflow, the extent to which the area served by the plant is built out, whether the permitted capacity differs from the design capacity, whether there are differences between the actual capacities of the individual components of the wastewater treatment plant and the permitted capacity of the plant, and whether flows have decreased due to conservation or a reduction in the number of customers.

Fla. Admin. Code Ann. r. 25-30.432 (2018) (emphases added). The Commission asserts that its treatment of pre-paid connections is "consistent" with the administrative rule "because it is within the Commission's discretion to determine what factors to consider based on the evidence of the case." Pre-paid connections are not among the factors specified, but the Commission views the list as non-exhaustive. Moreover, the Commission stresses that the "question of what factors should be used in calculating used and useful property is infused with policy considerations for which the Commission has special responsibility." The result is that the Commission sees its authority to include pre-paid connections as policy-driven based on its interpretation of its own rule, which says that "other factors" will be considered and that pre-paid connections is such a factor.

We recognize that Commission decisions on certain matters (such as percentages for used and useful purposes) are the type of discretionary determinations upon which "reasonable minds may differ," and that it is the "prerogative" of the Commission to evaluate and weigh the oftentimes conflicting evidence. *Citizens of State v. Fla. Pub. Serv. Comm'n,* 488 So. 2d 112, 114 (Fla. 1st DCA 1986). The question, however, is what legal authority exists for the Commission to consider pre-paid connections in determining what is used and useful for rate-making purposes, a purely legal question. The problem we have with the Commission's answer is that it is self-fulfilling: whatever the Commission views as an important policy factor becomes, by fiat under its administrative rule, a valid legal factor that it can apply as it sees fit. It sees the phrase "other factors" in its administrative rule as a potentially

8

limitless fount of regulatory power, even though the law the rule purports to implement—section 367.081(2)—cannot be read to support that expansive a result.

Section 367.081(2) does not mention pre-paid connections or similar items as part of the used and useful calculus, but it establishes a relatively open-ended allocation of regulatory authority to set rates and to include "operating expenses incurred in the operation of all property used and useful in the public service." We read the statute to apply to pre-paid connections, provided adequate proof is presented that pre-paid connections are "property" that falls within the statutory strictures of section 367.081(2) and that one of the temporal restrictions in subsection (2)(a) is met. As applied to this case, the Commission relies upon the restrictions in subsection (2)(a)2. b., the Five-Year/Five-Percent Law, which means that pre-paid connections must be shown to be property "needed to serve customers 5 years after the end of the test year," and further that those connections be subject to the grown rate limitation in that subsection.

From the record, we are unable to determine the extent to which the pre-paid connections at issue in this case fall within the statutory limits of the Five-Year/Five-Percent Law (pre-paid connections deemed necessary beyond five years are not part of the analysis because of the Commission's sole reliance on the Five-Year/Five-Percent Law). Nor are we in a position to evaluate how the five percent growth limitation is applied to permissible pre-paid connections to prevent a double-counting of growth. For these reasons, we remand the matter for further proceedings to determine the extent to which the pre-paid connections in this case meet the requirements of subsection (2)(a)2. b., the Five-Year/Five-Percent Law.

## C.

Finally, OPC argues that the Commission erred by imposing quality of service penalties on individual systems within UIF's consolidated system; it argues that the penalty statute doesn't speak to penalties on individual system within a consolidated system and that penalties should be imposed on UIF's system as a whole, the effect of which would be to spread the financial benefit

to all UIF customers and not just those served by the offending systems. The Commission counters that, assuming the issue was preserved (we conclude it was), it has always imposed penalties on a system-specific basis, which is not inconsistent with the statutes at issue.

The first statute, section 367.111(2), says: "If the commission finds that *a utility* has failed to provide its customers with water or wastewater service that meets the standards promulgated by the Department of Environmental Protection or the water management districts, the commission may reduce *the utility's* return on equity until the standards are met." § 367.111(2), Fla. Stat. (emphasis added). The second, 367.0812(4), states:

> The commission may prescribe penalties for *a utility's* failure to adequately resolve each quality of water service issue as required. Penalties may include penalties as provided in s. 367.161, a reduction of return on equity of up to 100 basis points, the denial of all or part of a rate increase for *a utility's system* **or part of a system** if it determines that the quality of water service is less than satisfactory until the quality of water is found to be satisfactory, or revocation of the certificate of authorization pursuant to s. 367.072.

§ 367.0812(4), Fla. Stat. (emphasis added). Based upon these two statutes, particularly the emphasized portions, we conclude that the Commission does not exceed its statutory authority when it imposes a financial penalty on a specific offending sub-utility within a consolidated system of utilities; although section 367.11(2) uses only the phrase "a utility" and thereby could be interpreted to mean a consolidated utility, it must be read in conjunction with section 367.0812(4), which allows for penalties on "part of a system" where the quality of water service is less than satisfactory. Together, these statutes are most reasonably read to allow for the type of utility-specific penalties meted out in this proceeding. We read the statutes as providing discretion to the Commission to impose targeted penalties "as required" under the circumstances of each case. Finding no error, we affirm the penalties.

Based on the foregoing, we affirm the Commission's order except as to that portion involving pre-paid connections, which we REVERSE and REMAND for further proceedings consistent with this decision.

OSTERHAUS and JAY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

James R. Kelly, Public Counsel, and Patricia Christensen and Virginia Ponder, Associate Public Counsels, Tallahassee, for Appellant.

Kathryn G.W. Cowdery, Senior Attorney, Keith C. Hetrick, General Counsel, and Samantha M. Cibula, Attorney Supervisor, Florida Public Service Commission, Tallahassee, and Martin S. Friedman of Friedman & Friedman, P.A., Orlando, for Appellees.