885 So.2d 286 (2004)
SPRINT-FLORIDA, INC., et al., and Verizon Florida, Inc., et al., Appellants/Cross-Appellees,
v.
Lila A. JABER, et al., Appellees/Cross-Appellees;
AT & T Communications of the Southern States, LLC, and TCG South Florida, Appellees/Cross-Appellants; and
BellSouth Communications, Inc., Cross-Appellee.
Nos. SC03-235, SC03-236.
Supreme Court of Florida.
September 15, 2004.
*288 John P. Fons of Ausley and McMullen, Tallahassee, FL, and Susan S. Masterton with Sprint, Tallahassee, FL, on behalf of Sprint-Florida, Inc., et al.; Marvin E. Barkin and Marie Tomassi of Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, St. Petersburg, FL; Kimberly Caswell, Tampa, FL, Aaron M. Panner of Kellogg, Huber, Hansen, Todd and Evans, P.L.L.C., Washington, DC, on behalf of Verizon Florida, Inc., et al.; David B. Erwin, Crawfordville, FL, on behalf of Frontier Communications of the South, Inc., for Appellants/Cross-Appellees.
Harold McLean, General Counsel, Samantha M. Cibula and David E. Smith, Tallahassee, FL, on behalf of the Florida Public Service Commission, for Appellees/Cross-Appellees.
Kenneth A. Hoffman and Martin P. McDonnell of Rutledge, Ecenia, Purnell and Hoffman, P.A., Tallahassee, FL, on behalf of AT & T Communications of the Southern States, LLC and TCG South Florida, for Appellees/Cross-Appellants.
Jack R. Reiter and Effie D. Silva of Adorno and Yoss, P.A., Miami, FL, on behalf of BellSouth Telecommunications, Inc., Cross-Appellee.
PER CURIAM.
We have on appeal and cross-appeal a decision of the Florida Public Service Commission (Commission) relating to rates or service of a telephone utility. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. These consolidated appeals are brought by Sprint-Florida, Inc., and Sprint Communications Company (collectively, Sprint) and Verizon Florida, Inc., ALLTEL Florida, Inc., and Frontier Communications of the South, Inc. (collectively, Verizon), and raise a single issue (herein referred to as the local calling area issue), determined by the Commission in order number PSC-02-1248-FOF-TP (order on reciprocal compensation), issued on September 10, 2002. AT & T, LLC, and TCG South Florida (collectively, AT & T) join the Commission in defending the order with regard to that issue but have filed a cross-appeal raising a second issue (herein referred to as the tandem interconnection rate issue), determined by the Commission in the same order.

GENERAL BACKGROUND
Until the mid-1990s, local telephone service within each of Florida's local calling areas was provided by a single company, which operated under an exclusive franchise granted by the State in exchange for the construction of extensive networks ensuring universal provision of service. Such companies are now known as incumbent local exchange carriers (ILECs). Meanwhile, service between local calling areas has been subject to competition for decades. Generally, when a call is placed between local calling areas, it is passed via a long-distance or interexchange carrier *289 (IXC), and the IXC must pay access charges to the ILECs at each end of the call. The Federal Communications Commission (FCC), which has authority over interstate calls, sets those access fees high to compensate local carriers for the use of their local facilities and to maintain low local rates.
In 1995, the Florida Legislature introduced competition into local telephone service by establishing procedures for the certification of alternative local exchange carriers (ALECs) to provide local service. See ch. 95-403, Laws of Fla. Likewise, in 1996, Congress passed the Telecommunications Act of 1996(Act), which was designed in part to foster competition in local markets. As a result, an ILEC's customer could call an ALEC's customer, or vice versa, within the same local exchange. Under such circumstances, section 251 of the Act requires the carrier serving the calling party to pay a reciprocal compensation fee to the other carrier for the cost of delivering and terminating the call.

PROCEEDINGS BELOW
On January 21, 2000, the Commission, on its own motion, established docket number 000075-TP, to investigate the appropriate method to compensate telecommunications carriers for the exchange of telecommunications traffic subject to section 251 of the Act.[1] ILECs, such as Sprint, Verizon, and BellSouth, and new ALECs, such as AT & T, were permitted to intervene in the Commission's investigatory proceedings. Commission staff and interested parties submitted issue identification lists, and on November 22, 2000, the Commission issued an order establishing the procedure for the docket and a tentative issue list of nine issues. Those nine issues related to compensation for internet service provider (ISP) traffic and became known as Phase I of the docket. On December 7, 2000, the Commission issued a supplemental order modifying the previously established procedure and including a supplemental issues list of eight additional issues. Those eight issues related to general compensation and become known as Phase II of the docket. At a later point, Phase I was stayed as a result of federal law developments,[2] and the Commission went forward with Phase II, which is the subject of this appeal.
On July 5 and 6, 2001, the Commission held an evidentiary hearing regarding the Phase II issues. On December 5, 2001, it held a special agenda conference, at which it announced decisions on issues 10, 12,[3] 14-16, 18, and 19 of Phase II but deferred decisions on issues 13[4] and 17. On May 8, 2002, the Commission held another evidentiary hearing, solely regarding issues 13 and 17. Thereafter, on September 10, 2002, by order number PSC-02-1248-FOF-TP, the Commission rendered its decision on all Phase II issues.
Within the order, the Commission determined that it had the authority to provide a definition of a local calling area for purposes of determining whether a particular call was local and subject to reciprocal *290 compensation fees or interexchange and subject to access charges. Having determined it had that authority, the Commission then reviewed three alternative definitions and held that a local calling area should be defined in the course of negotiations for interconnection agreements, but in the event the parties could not agree, the default definition would be the originating carrier's retail local calling area. Following issuance of the order, Verizon and Sprint filed motions for reconsideration, contesting this default definition. By order number PSC-03-0059-FOF-TP (order denying motions for reconsideration), issued January 8, 2003, the Commission denied those motions.
Also within the order under review, the Commission determined the circumstances under which an ALEC was entitled to be compensated at the higher tandem interconnection rate for delivery of calls originating from another carrier. The Commission found that an ALEC may be so entitled under (1) 47 C.F.R. § 51.711, when its switch serves a geographic area comparable to the area served by the ILEC's tandem switch; or (2) paragraph 1090 of In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCC Rcd 15499, CC Docket No. 96-98, First Report and Order (1996) (local competition order), when its switch performs functions similar to those performed by an ILEC tandem switch. Regarding the former, the Commission found an ALEC serves a comparable geographic area when it has deployed a switch to serve this area, has obtained NPA and NXXs[5] to serve the exchanges within this area, and can show that it is serving this area either through its own facilities or a combination of its own facilities and leased facilities connected to its collocation arrangements in ILEC central offices. Following issuance of the order, AT & T filed a motion for reconsideration of the requirements for compensation at the tandem interconnection rate. The Commission denied that motion as well.

STANDARD OF REVIEW
We note preliminarily that "orders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made." General Telephone Co. v. Carter, 115 So.2d 554, 556 (Fla.1959). Such deference, however, cannot be accorded when the Commission exceeds its authority. At the threshold, we must establish the grant of legislative authority to act since the Commission derives its power solely from the Legislature. See Florida Bridge Co. v. Bevis, 363 So.2d 799, 802 (Fla.1978). Additionally, this Court "will not reweigh or re-evaluate the evidence presented to the commission, but should only examine the record to determine whether the order complained of complies with essential requirements of law and whether the agency had available competent, substantial evidence to support its findings." Polk County v. Florida Public Service Commission, 460 So.2d 370, 373 (Fla.1984). Where the findings and conclusions comport with the essential requirements of law and are based on competent, substantial evidence, this Court will approve them. Fort Pierce Utils. Auth. v. Beard, 626 So.2d 1356 (Fla.1993).

THE LOCAL CALLING AREA ISSUE
In its order, the Commission noted that there was no significant disagreement *291 among the parties that it had jurisdiction to implement the rates, terms, and conditions of intercarrier compensation mechanisms for intrastate traffic so long as they are not inconsistent with the FCC's rules and orders governing intercarrier compensation. Additionally, the Commission adopted the consensus view among the parties that the policies established in the docket would stand as default mechanisms, effectively serving as regulatory standards to which a carrier may defer in the event negotiations between carriers regarding agreements on interconnections, services, or network elements are unsuccessful. One such default policy addresses the definition of "local calling area," which affects whether a call is subject to access charges or reciprocal compensation.[6] In this appeal, Verizon and Sprint argue that the Commission lacked the authority to define a local calling area. Additionally, they argue that the Commission's establishment of the originating carrier's retail local calling area as the default definition is not supported by competent, substantial evidence. The following sections address the specific arguments raised by Verizon and Sprint.

A. Authority Under Florida Law
In the order below, the Commission stated that its authority to provide a definition of a local calling area derives from section 364.01(4)(b), (g), and (i), Florida Statutes (2002), which provides:
The commission shall exercise its exclusive jurisdiction[[7]] in order to:
....
(b) Encourage competition through flexible regulatory treatment among providers of telecommunications services in order to ensure the availability of the widest possible range of consumer choice in the provision of all telecommunications services.
....
(g) Ensure that all providers of telecommunications services are treated fairly, by preventing anticompetitive behavior and eliminating unnecessary regulatory restraint.
....
(i) Continue its historical role as a surrogate for competition for monopoly services provided by local exchange telecommunications companies.
The Commission also cited Florida Interexchange Carriers Ass'n v. Beard, 624 So.2d 248, 251 (Fla.1993), wherein this Court stated:
By giving the Commission exclusive jurisdiction over telecommunications services, the Legislature has provided *292 the Commission with broad authority to regulate telephone companies.... The exclusive jurisdiction in section 364.01 to regulate telecommunications gives the Commission the authority to determine local routes.
On the basis of these authorities, the Commission concluded that it had the authority to define a local calling area where necessary to ensure the widest range of consumer choice and to eliminate barriers to competition. Because the Commission further found that the issue of defining a local calling area had become too commonplace in arbitration cases between carriers and some finality was necessary to avoid the issue being litigated multiple times, it decided to establish a default definition that was as competitively neutral as possible.
Sprint and Verizon, however, argue that section 364.01(4) provides only a general pronouncement of legislative intent and that sections 364.16(3)(a) and 364.163, Florida Statutes (2002),[8] more specifically prohibit the Commission's action. They assert that the decision to set the default definition as the originating carrier's local calling area allows ALECs to limit the charge to be paid to ILECs for terminating ALEC-originating calls by enlarging the ALECs' local calling areas. This practice, they argue, would run counter to the purposes behind the Legislature's 1995 enactment of sections 364.16(3)(a) and 364.163, which were to take away from the Commission the authority to adjust access charges and to prevent a diminution of access revenues to which ILECs are entitled. Sprint and Verizon argue that the specific provisions within sections 364.16(3)(a) and 364.163, therefore, must control over the general provisions of section 364.01(4).
In response, the Commission acknowledges that sections 364.16(3)(a) and 364.163 restrict its authority in the area of access charges but also asserts that those provisions relate to access charges once the local calling scope has been defined. The Commission points out that those sections contain no language expressly prohibiting it from defining a default local calling area. The Commission also acknowledges that the Legislature has reserved for itself the authority to determine access charge rates but asserts that revenues and rates are distinct entities in intercarrier compensation schemes and under the law.
Sprint and Verizon do not argue that sections 364.16(3) and 364.163 expressly and directly prohibit the Commission from establishing a definition of local calling area. Rather, Sprint and Verizon argue that the Commission's choice for the default, i.e., the originating carrier's local calling areas, will create a situation in which ALECs may circumvent access charges in violation of sections 364.16(3) and 364.163. However, what future actions ALECs may or may not take as a result of the Commission's order does not affect the Commission's jurisdiction to enter the order.[9] We agree with the Commission *293 that the Commission's broad authority to regulate telephone companies under section 364.01 provides the Commission with jurisdiction to enter an order that sets out the default provision.

B. 1999 Amendments to APA
Next, Verizon argues that the Legislature's 1999 amendments to the Administrative Procedure Act (APA), providing that agencies may adopt those rules that implement or interpret the specific powers and duties granted by the Legislature, overrules this Court's holding in Beard that section 364.01 provides broad authority to the Commission to adopt rules regulating telecommunications. However, we find this argument procedurally barred as it was not raised below.

C. The FCC's Local Competition Order
In addition to relying upon section 364.01 for authority, the Commission stated in its order:
Furthermore, [paragraph 1035 of the local competition order] appears unequivocal in granting authority to state commissions to determine what geographic areas should be considered "local areas" for the purpose of applying reciprocal compensation obligations under Section 251(b)(5) of the Act. ILEC parties offer nothing to dispute what appears to be a clear delegation of authority from the FCC to state commissions to make determinations as to the geographic parameters of a local calling area.
Sprint and Verizon contest this point and argue that reliance upon the local competition order is misplaced because that order did not delegate authority but, rather, simply expressed that the Act does not modify a state commission's existing authority over reciprocal compensation provisions.
Specifically, in a section primarily addressing the distinction between "transport and termination," which is subject to reciprocal compensation, and access services for long distance telecommunications, which are subject to access charges, the local competition order states:
With the exception of traffic to or from a CMRS network, state commissions have the authority to determine what geographic areas should be considered "local areas" for the purpose of applying reciprocal compensation obligations under section 251(b)(5), consistent with the state commissions' historical practice of defining local service areas for wireline LECs.

Local competition order ¶ 1035 (emphasis added). We conclude from the emphasized portion of this text that in implementing the local competition provisions of the Act, the FCC has not preempted state law regarding the issue of defining local service areas. While we do not agree with the Commission that the local competition order is a grant of authority to define a local calling area, we do find that it indicates that the Commission is not precluded by federal law from providing such a definition. Furthermore, because Sprint and Verizon have failed to show the Commission's *294 action with regard to the local calling area issue is preempted by federal law and have failed to overcome the statutory presumption that the Commission's order does not exceed its powers under state law, we conclude that the Commission has complied with the essential requirements of law.

D. Competent, Substantial Evidence
Finally, Sprint and Verizon argue that there is insufficient evidence in the record to support the Commission's choice of the originating carrier's retail local calling area as the default definition. They assert that the record does not support the determination that this method is the most competitively neutral.
In the order below, the Commission extensively reviewed the evidence supporting and opposing numerous default options. The Commission then reached the following conclusions:
We agree that using either the ILEC's retail local calling area or the LATA as a wholesale local calling area seems to suffer from a lack of competitive neutrality.
Using the ILEC's retail local calling area appears to effectively preclude an ALEC from offering more expansive calling scopes....
A LATA-wide wholesale calling regime appears to discriminate against IXCs....
We believe it is important that the default be as competitively neutral as possible. A default which is defined in accordance with the ILECs' preference for their existing retail local calling areas or the ALECs' preference for LATA-wide local calling may create a disincentive to negotiate. Adopting either of these two options would seem counterproductive, as it could chill negotiations and lead to one-sided outcomes.
....
One approach to defining the wholesale local calling area which receives less attention from the parties is to use the originating carrier's retail local calling area. BellSouth witness Shiroishi actually supports this approach and believes that such a plan is "administratively manageable," while acknowledging that there may be some concerns. In addition, she testifies that "BellSouth currently has the arrangement ... in many of its interconnection agreements." Of the options presented, we believe this approach is more competitively neutral than the others.
Verizon witness Trimble and Sprint witness Ward believe that BellSouth's proposal is administratively complex.... We note, however, that BellSouth witness Shiroishi explains that her company has implemented this approach through the use of billing factors....
The second complaint, that wholesale compensation should not vary depending on the direction of the call, is more thought-provoking since directional differences in compensation appear to be anomalous and inequitable. While we believe that such a plan may result in directional differences initially, we question whether these differences will be sustainable over time. As carriers experiment with different retail local calling areas, market forces will eventually determine which plans are most viable, and more uniformity will emerge as a result. In the short run, it is important to encourage experimentation, and this plan accomplishes that objective.
Order on reciprocal compensation at 53-54. Later, in addressing the parties' motions for reconsideration, the Commission responded to arguments similar to those raised in this appeal:

*295 Verizon argues that the originating carrier ruling provides the same disincentive to negotiate as the LATA-wide reciprocal compensation alternative. We clearly disagreed. Order at 53.
Verizon hypothesizes that the originating carrier ruling, because it will result in more uniform retail local calling areas, will eventually lead to uniform LATA-wide calling areas. However, Sprint reasons that because of the ILECs' statutory and regulatory constraints, the local calling areas would not even out over time. This divergence in opinions indicates that it is pure speculation that consumers' range of choice will diminish. We unmistakably considered the originating carrier local calling area to be the most competitively neutral and pointed out that market forces would eventually determine the most viable plans. Order at 53-54.
Further, we have only stated that the originating carrier local calling area is the most competitively neutral of the alternatives offered. Again, no error has been identified on this point.
Order denying motions for reconsideration at 14.
A review of the transcript of the Commission's May 8, 2002, hearing on the local calling area issue reflects that the ILEC parties, Verizon, Sprint, BellSouth, and ALLTEL, primarily argued for the ILEC's local calling area to be the default definition while the ALEC parties, AT & T, WorldCom, and FDN, primarily argued for a LATA-wide local calling area to be the default. The first witness to testify on this issue was BellSouth witness Elizabeth Shiroishi, who stated:
BellSouth's position is that, for purposes of determining the applicability of reciprocal compensation, a "local calling area" can be defined as mutually agreed to by the parties and pursuant to the terms and conditions contained in the parties' negotiated interconnection agreement, with the originating Party's local calling area determining the intercarrier compensation between the Parties. BellSouth currently has the arrangement described above in many of its interconnection agreements, and is able to implement such arrangement through the use of billing factors....
Although BellSouth believes that its plan is administratively manageable, BellSouth does understand the concerns raised as to the implementation of different calling areas. If the Commission ultimately determines that BellSouth's plan is not administratively feasible, BellSouth is in support of setting the default as the local calling scope ... as set forth in the ILEC's tariff....
Later in her testimony, Shiroishi agreed with the statement that defining the local calling area as anything other than the ILEC's or the originating carrier's local calling area would create arbitrage opportunities. Specifically, she testified that a LATA-wide calling area would create arbitrage opportunities[10] for IXCs and ALECs and that BellSouth had some interconnection agreements providing that the ILEC's local calling area would govern and some providing that the originating carrier's local calling area would govern. The second witness was Verizon witness Dennis Trimble, who testified that he recommended that the Commission "maintain the status quo  that is, approve the *296 [ILECs'] local calling area for purposes of applying intercarrier compensation." He also extensively testified regarding why a LATA-wide local calling area for reciprocal compensation purposes would put both the IXCs and the ILECs at a competitive disadvantage and enhance the ALECs' opportunities to arbitrage the ILEC's existing rate structures. His testimony only touched briefly on the use of the originating carrier's retail local calling area as the default:
Basing intercarrier compensation on the originating carrier's retail local calling area would be even worse than LATA-wide reciprocal compensation. This approach is administratively infeasible and fraught with irrational outcomes. It could enable ALECs to pay lower reciprocal compensation rates for outbound traffic, to receive higher access rates for inbound traffic, or even a combination of the two....
... [A]n ALEC may set up shop to market outbound calling services. In that case, it may establish a large "local" calling area for its retail customers, and would, under this misguided proposal, pay the lower reciprocal compensation rate for calls that would otherwise be subject to terminating access charges. But the same ALEC may instead choose to market inbound calling services. In that case, it would charge higher terminating access rates for its inbound traffic  for calls between the same local exchange carriers and the same geographic points to which it pays the lower reciprocal compensation rate.
....
... This approach will prompt ALECs to formulate business plans based on avoiding access charges and receiving maximum reciprocal compensation  rather than focusing on the end user.
The third witness was Sprint witness Julie Ward, who asserted Sprint's preference for the default definition to be based upon the ILEC's local calling scope and argued that a LATA-wide local calling scope would put IXCs at a severe competitive disadvantage. When asked about the use of the originating carrier's local calling area, Ward stated:
It is critical to recognize the inequitable competitive environment that is created when the originating carrier's local calling area determines the intercarrier compensation between carriers. The result of this approach would allow ALECs to pay lower reciprocal compensation rates for their traffic terminated within the LATA by ILECs (assuming the ALEC defines the LATA as the local calling area for retail purposes) while ILECs are forced to change their LCAs or to pay ALECs higher access rates for terminating ILEC-originated traffic. Spring agrees with Verizon witness Trimble in that the "direction of the call should play no part in the determining how intercarrier compensation should be assessed" (page 17). Furthermore, it would be administratively burdensome for all carriers, not just ILECs, to change their billing systems to maintain the varying local calling areas of each ALEC. BellSouth also recognizes and appreciates the concerns raised as to the implementation of different calling areas, as indicated on page 5 of Beth Shiroishi's testimony.
The fourth witness to address this issue was ALLTEL witness Alfred Busbee, who testified that defining the local calling area as something other than the ILEC's local calling area likely would have a financial impact on ILECs and require rate rebalancing.
Following the above ILEC witnesses, the next witness to testify was AT & T *297 witness Paul Cain. Cain testified that the Commission should adopt a LATA-wide local calling area default, arguing that all calls would then be rated local, simplifying the process of reciprocal compensation, and benefiting consumers by making it possible for ALECs to offer more flexible retail calling plans. Cain extensively testified to the practical effects and benefits of this default. He also testified that the ILECs advocated use of the ILEC's local calling area in order to limit competitive opportunities, with a cost structure that forces other carriers to limit the options available to their customers. In response to criticisms of the use of a LATA-wide calling area default, Cain asserted that the effect on ILECs and ALECs would be the same but conceded that IXCs might face erosion in their competitive position. Additionally, FDN witness John McCluskey testified that FDN proposed that the default definition be the LATA-wide calling area when the originating carrier hands off LATA-wide calls at the ILEC tandem serving the geographical location of the end user where the call terminates or, if the originator chooses, at the end office serving the geographical location of the end user where the call terminates. He argued that intercarrier compensation schemes that rely on the ILEC's retail local calling area foreclose price competition for retail intra-LATA services. Significantly, however, neither of these ALEC witnesses was asked about the option of establishing the originating carrier's retail local calling area as the default.
We find that this record provides competent, substantial evidence in support of the Commission's conclusion that use of either the ILEC's retail local calling area or a LATA-wide calling area as the default lacks competitive neutrality. The ILEC and ALEC parties are consistently divided in their preferences, with the ILECs supporting use of the ILEC's retail local calling area and the ALECs supporting use of a LATA-wide calling area. This supports the Commission's conclusion that adoption of either could chill negotiations and lead to one-sided outcomes in the establishment of interconnection agreements.
However, the Commission expressly acknowledged in its order that use of the originating carrier's retail local calling area received less attention from the parties in the proceedings below. As the above summary of the evidence indicates, little testimony was given regarding that option. While competent, substantial evidence  in the form of Shiroishi's testimony that BellSouth had many interconnection agreements that defined the local calling area as the originating carrier's retail local calling area and that BellSouth had been able to implement such agreements through the use of billing factors  supports the Commission's conclusion that such a default is administratively feasible, there is insufficient competent record evidence regarding the competitive neutrality of this option. The Commission appears to rely primarily on the fact that no party advocated for it as evidence of its competitive neutrality. But no witness testified that use of the originating carrier's retail local calling area as the default would be more competitively neutral. In fact, the only testimony addressing the effect on competition of this option came from Trimble and Ward, both of whom argued against it.
It appears the Commission chose the originating carrier's retail local calling area as the default definition primarily because no party advocated for it. However, we do not find that the record contains competent, substantial evidence that it is the most competitively neutral option. Because the record does not support the Commission's finding on that point, we *298 remand the case for further proceedings addressing the effect on competition of using the originating carrier's retail local calling plan as the default definition of "local calling plan" for purposes of reciprocal compensation.

THE TANDEM INTERCONNECTION RATE ISSUE
Cross-appellant AT & T argues that the Commission acted outside the scope of its powers in reaching certain findings regarding the tandem interconnection rate. Specifically, AT & T alleges that the Commission's order places requirements on ALECs, in order to be compensated at the tandem interconnection rate, that exceed those required by the FCC. AT & T argues that the FCC, in In re Petition of WorldCom, Inc. Pursuant to Section 252(r)(5) of the Comms. Act for Preemption of the Jurisdiction of the Virginia State Corp. Comm'n re Interconnection Disputes with Verizon Virginia, Inc., and for Expedited Arbitration, 17 FCC Rcd. 27039, CC Docket No. 00-218 et al., Memorandum Op. and Order (2002) (Virginia arbitration order), delineated the only requirement and thereby preempted any state commission action to the contrary. Additionally, AT & T asserts that the Commission's requirements impose an unlawful barrier to entry on ALECs, in violation of 47 U.S.C. § 253.
Following the enactment of the Act, the FCC adopted rules to implement the new, market-opening measures therein. However, "[u]nder the 1996 Act's design, it has been largely the job of the state commissions to interpret and apply those rules." Virginia arbitration order ¶ 1. The FCC's rulemaking "sets minimum, uniform, national rules, but also relies heavily on states to apply these rules and to exercise their own discretion in implementing a pro-competitive regime in their local telephone markets." Local competition order ¶ 22.
Prior to the Act, ILECs served virtually all subscribers in their local serving areas. Therefore, ILECs had little economic incentive to assist ALECs in entering the market by establishing interconnection agreements. An ALEC that constructs its own network will not necessarily need the services or facilities of an ILEC to enable its own subscribers to communicate with each other but will need an interconnection agreement with the ILEC to enable its customers to place calls to and receive calls from the ILEC's subscribers. Thus, the Act and subsequent FCC rules are designed to encourage interconnection agreements. One such rule is 47 C.F.R. § 51.711 ("rule 51.711"), which states in part:
(a) Rates for transport and termination of telecommunications traffic shall be symmetrical, except as provided in paragraphs (b) and (c) of this section.
(1) For purposes of this subpart, symmetrical rates are rates that a carrier other than an incumbent LEC assesses upon an incumbent LEC for transport and termination of telecommunications traffic equal to those that the incumbent LEC assesses upon the other carrier for the same services.
....
(3) Where the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent LEC is the incumbent LEC's tandem interconnection rate.
(Emphasis added.) As subsection (a)(1) indicates, the purpose of this rule is to require ILECs to pay rates to ALECs for use of the ALECs' services at the same level as the rates ILECs charge ALECs *299 for use of the ILECs' services. While this sort of rate symmetry is the standard, subsection (a)(3) is designed to address the additional costs incurred by a carrier when routing a call through a tandem switch as opposed to an end-office switch. As the FCC explained in the local competition order at paragraph 1090:
We find that the "additional costs" incurred by a LEC when transporting and terminating a call that originated on a competing carrier's network are likely to vary depending on whether tandem switching is involved. We, therefore, conclude that states may establish transport and termination rates in the arbitration process that vary according to whether the traffic is routed through a tandem switch or directly to the end-office switch. In such event, states shall also consider whether new technologies (e.g., fiber ring or wireless networks) perform functions similar to those performed by an incumbent LEC's tandem switch and thus, whether some or all calls terminating on the new entrant's network should be priced the same as the sum of transport and termination via the incumbent LEC's tandem switch. Where the interconnecting carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the interconnecting carrier's additional costs is the LEC tandem interconnection rate.
(Emphasis added.)
After the enactment of rule 51.711 and the issuance of the local competition order, some confusion arose regarding functional equivalency. Thus, in In re Developing a Unified Intercarrier Compensation Regime, 16 FCC Rcd. 9610, CC Docket No. 01-92, Notice of Proposed Rulemaking (2001) ("Intercarrier Compensation NPRM"), the FCC clarified that rule 51.711(a)(3) requires only a geographic area test and confirmed that a carrier demonstrating that its switch serves "a geographic area comparable to that served by the incumbent LEC's tandem switch" is entitled to the tandem interconnection rate. Id. ¶ 105.
In the proceedings below, the Commission addressed many issues regarding when an ALEC is entitled to be compensated at the ILEC's tandem interconnection rate. In its first finding, the Commission rejected the ILECs' argument of a two-pronged eligibility test requiring both geographic comparability and similar functionality. Relying on the local competition order, the Commission instead held that an ALEC is entitled to be compensated at the tandem interconnection rate when it establishes either geographic comparability or similar functionality. The Commission then defined the two tests of "similar functionality" and "comparable geographic area." AT & T's sole point of appeal relates to the Commission's definition of the latter. Regarding that test, the Commission framed the following question:
[I]n this issue we are to determine what qualifies an ALEC's network as serving a comparable geographic area to that served by an ILEC tandem switch....
... [W]e believe there are several sticking points that must be addressed.... The first is the interpretation of the word `serves' contained in FCC Rule 51.711(a)(3).... The debate revolves around whether this word means that an ALEC is actually providing service to a particular number of geographically dispersed customers in that area, or simply capable of providing service to customers throughout the area.
Order on reciprocal compensation at 14 (emphasis added). The ILEC parties argued for the Commission to adopt the *300 former meaning. However, the Commission concluded:
We believe that the appropriate application of the term "serves"... is that an ALEC should be found to serve a geographic area if it has prepared and offered a product throughout that area. Absent any direction from the FCC regarding what they meant by the word "serves" ..., we believe this more liberal interpretation is appropriate.
Order on reciprocal compensation at 17. The Commission then considered how an ALEC is to demonstrate that it is capable and prepared to serve a particular area. It concluded that "an ALEC `serves' a comparable geographic area when it has deployed a switch to serve this area, and has obtained NPA/NXXs to serve the exchanges within this area." Id. at 20. Additionally, the Commission found "that the ALEC must show that it is serving this area either through its own facilities, or a combination of its own facilities and leased facilities connected to its collocation arrangements in ILEC central offices." Id.
As already stated, AT & T, an ALEC, asserts in this appeal that the Commission's findings regarding how an ALEC is to demonstrate that it is capable and prepared to serve a particular area do not conform with FCC findings regarding the same in the Virginia arbitration order. In response, the Commission argues its order is entirely consistent with the Virginia arbitration order.
The Virginia arbitration order was rendered by the Wireline Competition Bureau, "acting through authority expressly delegated from the [FCC], stand [ing] in the stead of the Virginia State Corporation Commission," Virginia arbitration order at 1, which is the equivalent of the Florida Public Service Commission. The Wireline Competition Bureau summarized the arguments in the Virginia arbitration order, ¶ 304, as follows:
AT & T, WorldCom, and Verizon disagree about the standard for establishing geographic comparability under section 51.711(a)(3). AT & T and WorldCom argue that they are entitled to Verizon's tandem rate when any of their switches is capable of serving a geographic area comparable to the area served by Verizon's tandem switch. Verizon argues that the tandem rate is only available when the competitive LEC's switch actually serves a comparable geographic area.
The Wireline Competition Bureau held:
We agree, however, with AT & T and WorldCom that the determination whether a competitive LEC's switch "serves" a certain geographic area does not require an examination of the competitor's customer base.... We agree with AT & T and WorldCom, therefore, that the requisite comparison under the tandem rate rule is whether the competitive LEC's switch is capable of serving a geographic area that is comparable to the architecture served by the incumbent LEC's tandem switch.
Virginia arbitration order ¶ 309 (emphasis added). Thus, regarding the issue of whether rule 51.711 requires an ALEC to be actually serving an area, the Commission's order below is in agreement with the Wireline Competition Bureau's determination in the Virginia Arbitration Order.
The Wireline Competition Bureau went on to state in the Virginia arbitration order:
We find, moreover, that Verizon appears to concede that the AT & T and WorldCom switches satisfy this standard. In its brief, Verizon states, `At best, [AT & T] has shown that its switches may be capable of serving customers in areas geographically comparable to the areas *301 served by Verizon's tandems,' and, `[a]s with AT & T, [WorldCom] offered only evidence relating to the capability of its switches.' As we explain above, such evidence is sufficient under the tandem rate rule and Verizon fails to offer any evidence rebutting the evidence provided by the petitioners. Should there be any future dispute regarding the capability of the petitioners' switches to serve a geographical area comparable to Verizon's switches, we expect the parties to use their agreements' dispute resolution procedures to resolve them.
Id. This language indicates that, because Verizon conceded that the relevant ALECs in that case were capable of serving the particular area, the FCC never reached the issue of how an ALEC is to demonstrate that it is capable and prepared to serve a particular area. Therefore, the Commission's order below cannot conflict with the Virginia arbitration order on the question of how an ALEC is to demonstrate that it is capable and prepared to serve a particular area. In the absence of a conflict of legal holdings, we conclude that AT & T's argument that the FCC has preempted the Commission on the issue of proof of capability to serve must fail.
As for AT & T's argument that the Commission's ruling imposes an unlawful barrier to entry in violation of 47 U.S.C. § 253, we first note that this argument was not made below. We further note that the Commission expressly adopted the more liberal interpretation of rule 51.711, as advocated by the ALEC parties, in finding that an ALEC need not actually be serving a particular area to receive the tandem interconnection rate. Given the Commission's balanced decision that "a more liberal application of the term `serves' should be accompanied with a more detailed demonstration of network ability," order on reciprocal compensation at 18, we conclude that the Commission's findings do not "have the effect of prohibiting the ability of [an] entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253.

CONCLUSION
For the foregoing reasons, we affirm the Commission's decision below with regard to all issues except the Commission's determination that the originating carrier's local calling area is the most competitively neutral definition of the local calling area. With regard to that issue, we remand this case for further proceedings addressing the effect on competition of that default definition.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, QUINCE and BELL, JJ., concur.
WELLS, J., dissents with an opinion.
CANTERO, J., recused.
WELLS, J., dissenting.
I dissent because I believe that the appellants and cross-appellants lack standing to challenge the Public Service Commission's action. Therefore, I would grant the Commission's motions to dismiss these appeals and the cross appeal.
Section 120.68(1), Florida Statutes (2003), sets forth the standard for judicial review of administrative action and states that "[a] party who is adversely affected by final agency action is entitled to judicial review." Thus, there are four requirements for standing to seek judicial review: (1) the action is final; (2) the agency is subject to the provisions of the Administrative Procedure Act; (3) the person seeking review was a party to the action; and (4) the party was adversely affected by the action. See Daniels v. Florida Parole & Probation Comm'n, 401 So.2d *302 1351 (Fla. 1st DCA 1981). In this case, the Commission does not contest that the first three requirements are met. The order under review constitutes final agency action, the Commission is subject to the provisions of the Administrative Procedure Act, and the appellants and cross-appellants were allowed to intervene as parties in the proceedings below. However, I agree with the Commission that the appellants and cross-appellants are not shown to be adversely affected by the complained-of action.
In Legal Environmental Assistance Foundation, Inc. v. Clark, 668 So.2d 982, 987 (Fla.1996), this Court agreed with the following statement by the First District in Daniels, 401 So.2d at 1354:
The APA's definition of party recognizes the need for a much broader zone of party representation at the administrative level than at the appellate level. For example, in rulemaking, a large number of persons may be invited or permitted by the agency to participate as parties in the proceeding, so as to provide information to the agency concerning a broad spectrum of policy considerations affecting proposed rules. See America Balino v. Dept. of Health and Rehab., etc., 362 So.2d 21 (Fla. 1st DCA 1978). Yet, a person who participates in such a proceeding by authorization of a statute or rule, or by permission of an agency, may not necessarily possess any interests which are adversely, or even substantially, affected by the proposed action.
Thus, the fact that the appellants and cross-appellants were allowed to intervene in the Commission's investigatory proceedings below does not conclusively establish that they have standing to appeal the Commission's final agency action. In fact, the Commission's order under review specifically states:
The parties appear to agree that the policies in this docket should serve as a default mechanism. Therefore, the policies and procedures established in this docket shall be on a going forward basis, allowing carriers, at their discretion, to incorporate provisions into new and existing agreements.
This indicates that the appellants and cross-appellants may not be adversely affected by the order unless and until they (1) attempt to negotiate the local calling area or tandem interconnection rate terms of an interconnection agreement; (2) experience failed negotiations; (3) bring the matter to the Commission for arbitration; and (4) are forced against their interest to implement the policies and procedures established by the Commission. The negotiations involve many other issues, not just the issue here under review. The parties to negotiations give, take, and compromise on all issues, and this is only one of the issues forming their final agreements. To date we have not reviewed an actual case in controversy in which a party is complaining about the Commission imposing a default provision. Therefore, I conclude these appeals and the cross appeal are premature and that the arguments made therein should not be considered until this or another court is presented with an appeal from an arbitration proceeding in which the Commission imposes the policies set forth below to the detriment of an appealing party with proper standing. In sum, this Court is called upon to decide a hypothetical agreement. I would refrain from doing that.
NOTES
[1] Section 251(b)(5) requires interconnecting LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications."
[2] On March 7 and 8, 2001, the Commission conducted an administrative hearing, at which Phase I issues were addressed. Thereafter, the FCC released a decision addressing ISP-bound telecommunication traffic. As a result, the parties below stipulated with the Commission to stay Phase I proceedings.
[3] Issue 12 of Phase II addressed the tandem interconnection rate, which is the subject of the AT & T cross-appeal before this Court.
[4] Issue 13 of Phase II addressed the definition of "local calling area," which is the subject of Verizon and Sprint's appeal before this Court.
[5] Telephone numbers are in ten-digit format, consisting of a three-digit numbering plan area (NPA) code, a three-digit central office code (NXX code), and a four-digit station address code.
[6] "[T]ransport and termination of local traffic are different services than access service for long distance telecommunications." Local competition order 1033.

Access charges were developed to address a situation in which three carriers  typically, the originating LEC, the IXC, and the terminating LEC  collaborate to complete a long-distance call. As a general matter, in the access charge regime, the long-distance caller pays long-distance charges to the IXC, and the IXC must pay both LECs for originating and terminating access service. By contrast, reciprocal compensation for transport and termination of calls is intended for a situation in which two carriers collaborate to complete a local call. In this case, the local caller pays charges for the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call.
Id. 1034 (footnote omitted).
[7] Section 364.01(2) states, "It is the legislative intent to give exclusive jurisdiction in all matters set forth in this chapter to the Florida Public Service Commission in regulating telecommunications companies...."
[8] Section 364.16(3)(a), Florida Statutes (2002), provides:

No local exchange telecommunications company or alternative local exchange telecommunications company shall knowingly deliver traffic, for which terminating access service charges would otherwise apply, through a local interconnection arrangement without paying the appropriate charges for such terminating access service.
Section 364.163, Florida Statutes (2002), provides caps and adjustments to access charges for network service access.
[9] Sprint and Verizon also assert that the Commission's findings run counter to its order in In re Petition for Arbitration of Dispute With BellSouth Telecommunications, Inc. re Call Forwarding, by Telenet of South Florida, Inc., 97 F.P.S.C. 4:519 (1997), which arose out of a dispute between BellSouth and Telenet over the manner in which Telenet was using BellSouth's call-forwarding services. Specifically, Telenet was using those services to route calls in such a way that the calls would always be local and access charges would not apply. The Commission found Telenet was knowingly avoiding the payment of applicable access charges, in violation of section 364.16(3)(a). Id. at 4:527. We find that rather than establishing that the Commission acted without authority in the present case, the Telenet order demonstrates that ALECs that are tempted to circumvent access charges in the manner suggested by Sprint and Verizon may likewise be found in violation of section 364.16(3)(a).
[10] Shiroishi explained that the use of a LATA-wide calling area would blur the line between local and switched access calls and allow an IXC that is also an ALEC to use its IXC as their local prescribed carrier, thereby avoiding the payment of access charges on calls that would normally be subject to access charges.